**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: March 28, 2025.**

_____
MICHAEL M. PARKER
UNITED STATES BANKRUPTCY JUDGE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § § | |
| SUSHI ZUSHI OF TEXAS, LLC, | § § | CASE NO. 24-51147-MMP |
| SUSHI ZUSHI OF STONE OAK, LLC, | § § | CASE NO. 24-51373-MMP |
| SUSHI ZUSHI OF LINCOLN HEIGHTS, LLC, | § § | CASE NO. 24-51372-MMP |
| SUSHI ZUSHI OF COLONNADE, LLC, | § § | CASE NO. 24-51371-MMP |
| DEBTORS. | § § § | CHAPTER 11 JOINTLY ADMINISTERED UNDER CASE NO. 24-51147-MMP |

OPINION

I.    **INTRODUCTION**

Before the Court is the confirmation of four separate chapter 11 cases, jointly administered under Case No. 24-51147-mmp. The Court held a confirmation hearing on the four separate plans of reorganization. During the hearing, Debtor Sushi Zushi of Texas, LLC ("**Debtor**") argued that its plan (ECF No. 189, Case No. 24-51147-mmp) ("**SZ Plan**"), filed in a case under subchapter V

of chapter 11[1], should be confirmed consensually under § 1191(a)[2] despite the lone creditor in the first class failing to submit a ballot. Separately, the Court raised at the confirmation hearing a question about the timing of the Debtor's ability to "lien-strip" in a non-consensual plan under § 1191(b), assuming the Debtor could not confirm under § 1191(a).

The Court finds that the SZ Plan cannot be confirmed under § 1191(a) but can still be confirmed as a non-consensual plan under § 1191(b).[3] The Court concludes that the liens unsupported by collateral (i.e. the liens that are in a lien position for which no remaining collateral value exists) can be made void as of the effective date, under the plan.

## II. JURISDICTION

The Court has jurisdiction under 28 U.S.C. §§ 157 and 1334, and the Standing Order of Reference of the United States District Court for the Western District of Texas, dated October 4, 2013. This is a core proceeding under 28 U.S.C. § 157(b)(2)(L). Venue is proper under 28 U.S.C. § 1408.

## III. BACKGROUND

The Debtor operates multiple sushi restaurants in the San Antonio metropolitan area. The Debtor filed its petition under subchapter V of chapter 11. Debtor's operating affiliates also filed cases under Case Nos. 24-51371-mmp (*In re Sushi Zushi of Colonnade, LLC*), 24-51372-mmp (*In re Sushi Zushi of Lincoln Heights, LLC*), and 24-51373-mmp (*In re Sushi Zushi of Stone Oak, LLC*) (collectively, "**Operating Entities**"). The Court permitted the affiliates' and the Debtor's cases to be jointly administered. ECF No. 97. Although the Operating Entities' cases were originally filed under subchapter V, their petitions were amended to instead proceed as traditional

---

[1] Case Nos. 24-51371, 24-51372, and 24-51373 are proceeding as traditional chapter 11 cases.
[2] All statutory citations and references are to title 11 of the United States Code, unless otherwise noted.
[3] The Court will separately enter orders confirming the companion plans for each of the Operating Entities.

chapter 11 cases. The Operating Entities' cases were confirmed and are not the subject of this *Opinion*.

The Debtor's case, however, remained the lone case of the four which sought to be confirmed under § 1191(a) of subchapter V. The Debtor filed a *Fourth Amended Plan of Reorganization* (ECF No. 189) which created five classes of creditors. Relevant to this *Opinion*, Class 1 contained only one creditor, the Debtor's dominant secured lender Gulf Coast Financial ("**Gulf Coast**"). Classes 1, 2, and 3 were the only impaired classes entitled to vote under the SZ Plan.

Additionally, the SZ Plan addressed claims held by Prosperum Capital Partners, LLC, WebBank, 1st Alliance Group, LLC, EBF Holdings, LLC, and U.S. Foods, Inc. (referred to here and in the SZ Plan as the "**Unsecured UCC Claimants**"). The SZ Plan treats the Unsecured UCC Claimants as effectively unsecured because Gulf Coast's lien encumbers all of the Debtor's assets, leaving no collateral to which the Claimants' liens could attach. Under the SZ Plan, liens held by the Unsecured UCC Claimants would be extinguished as of the effective date of the SZ Plan.

The Debtor received the completed ballots and filed a *Balloting Tabulation on Debtor's Plans of Reorganization* (ECF No. 207). All members of Classes 2 and 3 voted in favor of the SZ Plan. Gulf Coast in Class 1, however, chose not to file a ballot. At the confirmation hearing, Gulf Coast appeared through counsel. While counsel stated that Gulf Coast did not oppose plan confirmation, it affirmatively declined to submit a ballot voting in favor of the SZ Plan—notwithstanding Debtor's counsel's repeated requests.

The Debtor argued at the confirmation hearing that, notwithstanding Gulf Coast's failure to submit a ballot, the Court could confirm the case as a consensual plan under § 1191(a). The Court heard Debtor's argument to this effect, but also instructed the Debtor to present its case for confirmation as if confirming under § 1191(b). The Debtor further argued that even if the Court

can only confirm a nonconsensual plan under § 1191(b), the Debtor should be permitted to "lien strip" junior liens as of the effective date of the plan.

IV. **DISCUSSION**

    a. **The SZ Plan may be confirmed only under § 1191(b) as a nonconsensual plan of reorganization.**

Subchapter V of chapter 11 of the Bankruptcy Code provides a streamlined bankruptcy process aimed at helping small businesses swiftly address their debts and reorganize their financial affairs. In enacting subchapter V, Congress sought to encourage "consensual" plans of reorganization by including benefits for debtors who managed to confirm plans under § 1191(a). These benefits include a discharge on the date of confirmation (instead of after completion of all plan payments) and the ability for the debtor to act as the plan's disbursing agent (instead of the Subchapter V Trustee). §§ 1192, 1194(b).

Plans may be confirmed only under § 1191(a) if all requirements of § 1129(a), other than paragraph (15) of that section, are met. Relevant here, § 1129(a)(8) requires that "[w]ith respect to each class of claims or interests—(A) such class has accepted the plan; or (B) such class is not impaired under the plan." A class of claims has "accepted" a plan if "such plan has been accepted by creditors…that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors…that have accepted or rejected such plan." § 1126(c).

Based on the language of the statute, the SZ Plan cannot be confirmed under § 1191(a) because Class 1, occupied solely by Gulf Coast, failed to cast a vote "accepting" the plan. Gulf Coast appeared at the confirmation hearing on the SZ Plan and reiterated its position that while it

was not opposed to confirming the proposed plan, it would not be submitting a ballot in favor of plan confirmation.

The Debtor, undeterred, directs the Court to a pair of decisions out of the Southern District of Texas, which hold that a class's failure to vote does not prevent consensual confirmation under § 1191(a). *See* ***In re Franco's Paving, LLC***, 654 B.R. 107 (Bankr. S.D. Tex. 2023); ***In re Hot'z Power Wash, Inc.***, 655 B.R. 107 (Bankr. S.D. Tex. 2023). The Debtor also gestured toward Gulf Coast's continuous involvement in the case and appearance at the confirmation hearing as further support of their consent to the plan.

The courts in ***Franco's Paving*** and ***Hot'z Power Wash*** found that a non-voting class is ignored when determining whether a plan has satisfied § 1129(a)(8). Both courts argue that a Congressional preference in favor of persuading Debtors to confirm consensual plans means that Congress did not contemplate that there could be an impaired class where no creditor voted. The Court is unpersuaded.

Congressional preference for consensual plans does not require a court to interpret all statutory language in subchapter V in favor of confirmation of consensual plans any more than the Code's goal of a "fresh start" means that a court should interpret statutory language to grant a debtor and its associates a broad, unrestricted discharge regardless of (i) debtor misbehavior, (ii) notice to creditors and (iii) specific exceptions to discharge. It's true that Congress would prefer that a debtor would *propose* a plan which would encourage creditors to affirmatively vote for it, but nothing in the Code converts a creditor's pacificity or affirmative decision *not* to vote (as in this case) into and affirmative vote in favor of the plan.

The ***Franco's Paving*** and ***Hot'z Power Wash*** courts reasoned that calculating § 1126(c) without a voting creditor renders an indeterminate amount[4] that is "absurd, unsolvable, and was

---

[4] The "indeterminate amount" is caused by a calculation with a denominator of 0—because § 1126(c) only contemplates voting creditors, attempting to calculate 66.6% or 50% of 0 ends with an undefined result.

not contemplated by Congress." *Hot'z Power Wash*, 655 B.R. at 118. The Court understands the attempt to apply the fractional formula established by § 1126(c), and the truism that any "0" in the denominator of a fraction creates an unsolvable mathematical problem. The Court does not, however, believe the statute requires that sort of mathematical calculation.

This Court joins the courts who have declined to adopt the *Franco's Paving* and *Hot'z Power Wash* approach. *E.g.*, *In re M.V.J. Auto World, Inc.*, 661 B.R. 186 (Bankr. S.D. Fla. 2024); *In re Florist Atlanta*, Case No. 24-51980, 2024 Bankr. LEXIS 1842 (Bankr. N.D. Ga. Aug. 6, 2024); *In re Thomas Orthodontics, S.C.*, Case No. 23-25432, 2024 Bankr. LEXIS 2334 (Bankr. E.D. Wisc. Sept. 25, 2024). The notion that Congress did not contemplate a non-voting class of creditors is contravened by § 1126 itself, which provides in subsection (a) that creditors *may* accept or reject a plan. By using the permissive "may" instead of the mandatory "shall," Congress left open a third option—the possibility that creditors could choose not to vote on a plan. Impaired creditors are not confined to a binary "accept/reject" but instead may abstain. The text of the Code affords impaired creditors the strategic decision to abstain from voting, potentially to be used as leverage against a debtor whose plan offers the creditor more than liquidation value (precluding an objection), but less than that which satisfies the creditor.

The arithmetic of § 1126(c) is intended to answer the question: does this group of creditors agree with the debtor's plan? Dividing by zero or not, engaging in the arithmetical exercise becomes futile where no creditors in a class vote. The majority and numerosity provisions of the statute need not be considered once the numerator in the equation is determined to be "0" (i.e., no creditor voted). There is no reason to consider an "absurd, unsolvable" denominator because when

no creditors in a class affirmatively vote, the class cannot accept the plan, no matter what the denominator may be.

A class's acquiescence is not enough. Where there is no affirmative act[5] by any individual creditor within a class, the Court struggles to see how the class can "accept" the plan. The courts in *Franco's Paving/Hot'z Power Wash* attempted to distinguish their approach from both the *Ruti-Sweetwater* line of cases (holding a class's failure to vote should be deemed to implicitly accept the plan, 836 F.2d 1263 (10th Cir. 1988)), and cases which deem non-votes as rejections. Instead, the courts in *Franco's Paving/Hot'z Power Wash* charted a third course—the bankruptcy court can merely "ignore" or "not count" the non-voting class.

But the Code does not contemplate this undefined third approach. A class either accepts the plan under § 1129(a)(8), or it does not. Whether the individual creditors in the class have accepted, rejected, or abstained, the Court need only consider whether the class has "accepted"—if it hasn't accepted, the section is simply not met. The Debtor must show the class accepts, not merely that the class "doesn't reject." Nothing in the Code allows the Court to equate abstention of a class with acceptance.

Part of the confusion arises from the fact that the Code allows *individual* creditors to "accept" or "reject" (via § 1126(a)), but only defines how a *class* "accepts." Classes, under the Code, can only "accept" or simply do not accept—there is no definition of a "rejecting class."[6] Thus, *Hot'z Power Wash*'s posed question of "whether a nonvoting class should be treated as having rejected a plan" does not follow. Although individual creditors may reject a plan, *classes* cannot—they can only fail to accept. *Hot'z Power Wash*, 655 B.R. at 116. More than a mere

---

[5] As individual "acceptance" is not defined by the Code, the Court resorts to the common understanding and definition of the word "accept," which is "to make a favorable response to." MERRIAM-WEBSTER DICTIONARY (online ed. 2025) (giving the example, "to accept an offer").

[6] Consider, for example, a class of one hundred creditors with equal claims where ten creditors affirmatively vote to reject the plan, and ninety creditors do not vote at all. Does the class "reject" the plan? Or does the class "not accept"? Under the Code, the answer doesn't matter—§ 1126 only asks whether the class "accepts" or not.

semantic triviality, this lack of "rejection" undermines that court's reason for avoiding a class's rejection where no creditors in that class vote. That court reasoned it could not deem the class's abstention as a rejection because of the formality requirements in Federal Rule of Bankruptcy Procedure 3018(c) for acceptances and rejections. But Rule 3018(c) only applies to an individual creditor's acceptance or rejection of a plan. A *class*'s acceptance or lack of acceptance, however, has no formality requirement under the Rules.

Moreover, the ***Franco's Paving/Hot'z Power Wash*** courts' "ignoring" approach functionally leads to the same outcome as if the courts had deemed the non-voting class as accepting, implicitly following the ***Ruti-Sweetwater*** line of cases they were attempting to evade. To reiterate, § 1129(a)(8) requires a showing that with respect to each class, either the class has accepted the plan or the class is not impaired under the plan. "Not counting" a class when trying to determine whether the section is satisfied is functionally identical to determining that: (i) the class accepts the plan (even if it doesn't), (ii) the class is not impaired (even if impaired), or (iii) the class doesn't exist at all (even if, as here, the class contains the largest creditor in the case).

The approach itself invites an absurd scenario: could a debtor confirm a plan consensually where *no* creditors vote at all? If non-voting classes are disregarded when analyzing § 1129(a)(8), a debtor could theoretically confirm a "consensual" plan under § 1191(a) without a single accepting vote if no creditors vote at all, as all of the non-voting classes are "ignored."[7] The Court cannot endorse a reading which could result in this logical conclusion.

Impaired classes whose creditors fail to cast a vote do not "accept" a plan, and therefore § 1129(a)(8) cannot be met. Section 1129(a)(8) requires that all impaired classes accept a plan. Whether or not the creditors "reject" a plan or stand silent is immaterial when determining whether

---

[7] Of course, such a debtor would have to contend with § 1129(a)(10), which requires that if there is an impaired class, at least one impaired class must accept the plan. But if the Court accepted the "ignore" approach as to (a)(8), there's no reason why it wouldn't similarly counsel ignorance of the class under (a)(10)—yet another reason why the ***Franco's Paving/Hot'z Power Wash*** approach should be rejected.

(a)(8) is satisfied. As the court in *In re M.V.J. Auto World, Inc.* noted, "[i]t is not absurd that no creditors in a class voting on a plan should be treated any differently than a situation where there is not a sufficient number of creditors voting in favor of a plan to satisfy section 1129(a)(8)." 661 B.R. at 190.

From a policy standpoint, the apathy of creditors who fail to vote is not a sufficient reason to override what § 1129(a)(8) requires. In support of its argument, the court in *Hot'z Power Wash* cited to a Southern District of New York case which, in defending the *Ruti-Sweetwater* opinion, stated that "[r]egarding non-voters as rejecters…subjects those who care about the case to burdens (or worse)…," and that such a decision would upset the "principle on which the bankruptcy community often relies, as creditor democracy could otherwise be frozen as a consequence of the disinterest of others." *In re Adelphia Commc'ns. Corp.*, 368 B.R. 140, 262 (Bankr. S.D.N.Y. 2007). But the risks of apathetic parties are inherent to the democratic process—and consensual confirmation is inherently a democratic process. Democracy functions well if parties who share an interest in its outcome participate, but complete participation is not a precondition to a well-functioning democracy. Choice, however, is. Participants are entitled to choose *not* to vote—and not be treated as having voted. Instead of blaming the "freezing of the bankruptcy process" on apathetic creditors, perhaps it is incumbent on debtors (and creditors who support the plan) to demonstrate to the non-voting creditors why their plan should be affirmatively voted for, whether through persuasion or through plan concessions.

The Court also greatly discounts any reliance on Gulf Coast's lawyer's participation in a confirmation hearing as evidence of an affirmative vote in favor of a plan confirmation. Appearance at a confirmation hearing is the only certain way to protect a client's interests from being infringed through the confirmation process. Because multiple different creditors and stakeholders appear through counsel at such hearings and request relief be added to a confirmation order, the only certain way to protect a client's interest is to show up at the hearing, whether your

client voted for the plan or not. Treating an appearance, or mere participation in the case, as an affirmative vote for a plan would place an attorney between Scylla and Charybdis[8], and inappropriately prevent an attorney from competently representing a client. Moreover, mere attendance at a confirmation hearing fails to satisfy the requirements of Federal Rule of Bankruptcy Procedure 3018(c)(1)(A), which requires that an acceptance or rejection of a plan must be in writing. Attendance at a confirmation hearing alone is not an affirmative vote for a plan.

Here, because Gulf Coast did not submit a ballot affirmatively voting to accept the SZ Plan, § 1129(a)(8) was not satisfied and the plan cannot be confirmed under § 1191(a). There is, however, sufficient evidence that the plan satisfies all other applicable requirements of § 1129(a)(8), and therefore the plan can be confirmed non-consensually under § 1191(b).

### b. A subchapter V plan of reorganization confirmed under § 1191(b) may "lien-strip" as of the effective date of the plan.

At the confirmation hearing, the Court, sua sponte, raised the question about the exact timing of when the Debtor may avoid "out-of-the-money" liens on collateral. The SZ Plan provides that the liens of the Unsecured UCC Claimants "shall be extinguished [as] of the Effective Date." The Court finds that the provision is proper and the Unsecured UCC Claimants' liens may be voided as of the effective date.

Section 1123(b)(5) allows a plan to "modify the rights of holders of secured claims," subject to an exception for security interests in property that is the principal residence of the debtor. Unlike in chapter 13 cases, where under § 1325(a)(5)(B) secured lenders retain their liens until discharge, subchapter V cases have no such limitation for either consensual or non-consensual plans, even though discharge under a non-consensual plan does not come until three to five years after confirmation. § 1192. In fact, subchapter V appears to provide debtors an even broader ability

---

[8] In Greek mythology, Scylla and Charybdis were sea monsters who posed a deadly threat to sailors in the Strait of Messina, forcing them to choose between two equally dangerous options.

to "lien-strip" than in traditional chapter 11, as it provides an exception to the principal residence exception mentioned above. § 1190(3).

Therefore, the plan as drafted can be confirmed under § 1191(b) and the Unsecured UCC Claimants' liens will be extinguished as of the effective date.

V. **CONCLUSION**

In conclusion, the SZ Plan can be confirmed only as a non-consensual plan under § 1191(b). An impaired class of creditors which fails to cast a ballot does not satisfy the requirements of § 1129(a)(8), and therefore Gulf Coast's failure to vote precludes a consensual confirmation. The liens held by the Unsecured UCC Claimants may properly be extinguished as of the effective date of the SZ Plan. The Court will enter a separate order confirming the plan under § 1191(b)

# # #